**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Case No. 18-cv-00104-RM-MEH

TELIAX, INC.,

    Plaintiff,

v.

VERIZON SERVICES CORP.,

    Defendant.

___

**OPINION AND ORDER**
___

On January 12, 2018, Plaintiff Teliax, Inc. ("plaintiff") filed a Complaint against Defendant Verizon Services Corp. ("defendant"), asserting the following claims for relief: (1) violation of Section 201(b) of the Communications Act, 42 U.S.C. § 201(b) (Claim One); (2) breach of contract (Claim Two); (3) account stated (Claim Three); (4) quantum meruit (Claim Four); and (5) unjust enrichment (Claim Five). (ECF No. 1.)

On February 28, 2018, defendant filed a partial motion to dismiss Claims One, Three, Four, and Five ("the motion to dismiss"), pursuant to Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"). (ECF No. 22.) Plaintiff filed a response to the motion to dismiss (ECF No. 23), and defendant then filed a reply (ECF No. 24).

**I.**     **Legal Standard**

In evaluating a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the

non-moving party, and draw all reasonable inferences in the plaintiff's favor. *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135-36 (10th Cir. 2014); *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010). In doing so, "a court may look both to the complaint itself and to any documents attached as exhibits to the complaint." *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001). In the complaint, the plaintiff must allege a "plausible" entitlement to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-556, 127 S.Ct. 1955 (2007). Conclusory allegations, however, are insufficient. *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009). A complaint warrants dismissal if it fails "*in toto* to render [plaintiff's] entitlement to relief plausible." *Twombly*, 550 U.S. at 569 n.14.

## II.     Factual Background

The Court assumes the truth of the following pertinent, non-conclusory allegations from the Complaint.

Plaintiff's business is primarily engaged in the telecommunications industry. (ECF No. 1 at ¶ 6.) For several years, plaintiff has routed telephony call traffic, and provided related services, to defendant for which defendant was required to pay plaintiff pursuant to a tariff ("the Tariff") that plaintiff filed with the Federal Communications Commission ("the FCC"). (*Id*. at ¶ 7.) As a result of certain disputes between plaintiff and defendant regarding payments owed by defendant pursuant to the Tariff, the parties entered into a Confidential Settlement Agreement and Release as of January 26, 2015 ("the Settlement Agreement"). (*Id*. at ¶ 8.)

One of the services plaintiff provides is "toll free" or "8YY" calling. (*Id*. at ¶ 9.) Toll-free service involves a subscriber agreeing to pay an interexchange carrier ("IXC") for all calls made to

it using a pre-designated 800 number. (*Id*.) Plaintiff also provides interstate toll-free origination services on both a retail and wholesale basis. (*Id*. at ¶ 12.)

On or about October 24, 2017, defendant informed plaintiff that it believed most of the 8YY calls plaintiff sent to defendant were fraudulent in nature. (*Id*. at ¶ 18.) In response, plaintiff offered to identify and block such calls before delivery to defendant. (*Id*. at ¶ 19.) In order to take this action, plaintiff requested that defendant provide information used to identify calls as fraudulent. (*Id*.) Defendant refused to provide plaintiff with the requested information. (*Id*. at ¶ 20.) Instead, defendant continued to accept all 8YY calls from plaintiff, and continued to deliver such calls to its toll-free subscribers and bill them for these calls. (*Id*.) Despite accepting the calls, defendant has refused to pay plaintiff's billed charges for the same. (*Id*. at ¶ 21.) As of the filing of the Complaint, defendant owed plaintiff for amounts invoiced in September, October, November, and December 2017. (*Id*. at ¶ 15.) Invoices attached to the Complaint allegedly reflect that the total amount invoiced and not paid equals $1,251,928.32. (*Id*.) The amounts owing to plaintiff under the invoices are due pursuant to the terms of the Settlement Agreement. (*Id*. at ¶ 8.)

On October 30, 2017, pursuant to the Settlement Agreement, defendant sent written notice, advising plaintiff that the Settlement Agreement would terminate on November 30, 2017. (*Id*. at ¶ 16.) After November 30, 2017, services provided to defendant will be billed pursuant to the Tariff. (*Id*.)

## III. Discussion

In the briefing on the motion to dismiss, the parties split their arguments into two categories. A category related to Claim One, and a category related to Claims Three to Five. The Court follows the same approach herein.

## A. Claim One—Violation of the Communications Act

Defendant argues that Claim One should be dismissed as a matter of law because (1) it cannot violate § 201 of the Communications Act because it is not a "common carrier" for purposes of the provision, and (2) even if it was a common carrier, the FCC has never imposed a duty to disclose all facts leading to the identification of fraudulent toll-free calls. (ECF No. 22 at 16-19.)[1] In response, plaintiff argues that defendant is "clearly operating as a carrier" in refusing plaintiff's requests for information. (ECF No. 23 at 15-16.) Plaintiff further argues that there is a FCC-imposed duty on defendant to turn over the information plaintiff has requested. (*Id*. at 15-19.)[2]

The Court agrees with defendant on both matters. First, in its response, plaintiff utterly fails to address defendant's argument, and the decision from the FCC cited in supported thereof, as to why it is not a common carrier for purposes of § 201. Instead, plaintiff makes unsupported assertions, such as that "[t]he duty to prevent fraud applies to all carriers regardless of their status" (ECF No. 23 at 15), or speculates that the FCC "would never allow a carrier to close its eyes to fraud merely because the fraud is related to purchased access services rather than supplied access services" (*id*. at 16).

In addition, the Court finds that the decision defendant cites, *All Am. Tel. Co. v. AT&T Corp.*, 26 FCC Rcd 723 (2011), supports its argument that plaintiff cannot bring a claim under § 201

---

[1] Unless otherwise noted herein, the Court cites to the page numbers assigned in the top right-hand corner of a filing by the CM/ECF system, rather than any other page number that may appear in the same.

[2] Plaintiff also argues that defendant's "self-help remedies" have "compounded" the purported violation of the Communications Act. (ECF No. 23 at 19.) Plaintiff, though, cites to no part of the Complaint to support its contention that defendant has admitted to withholding payments for legitimate call traffic. (*See id*.) The violation of the Communications Act alleged in the Complaint is premised upon the withholding of information, not the withholding of payments. Therefore, the Court does not consider this argument further.

because defendant is not a common carrier in the context of the relationship between the parties. In that decision, the FCC held that the Communications Act "generally governs a carrier's obligations to its customers, and not vice versa. Thus, although a customer-carrier's failure to pay another carrier's tariffed charges may give rise to a claim in court for breach of tariff/contract, it does not give rise to a claim at the [FCC] under section 208 (or in court under section 206) for breach of the Act itself." *Id*. at 727. Although that decision involved a claim brought under § 201 for failure to pay charges under a tariff, while this case involves a claim of failure to provide information, the Court sees no reason why that difference would change the result. Ultimately, as the FCC stated, the Communications Act governs a carrier-customer relationship. Here, the carrier was plaintiff because it carried telephone calls to defendant, and defendant was the customer because it was meant to pay plaintiff for delivering those calls to it. In a footnote, with little explanation, plaintiff asserts that defendant is a carrier because it delivers the calls carried by plaintiff to subscribers. (ECF No. 23 at 16 n.17.) However, the fact that defendant may have a different relationship with its subscribers, than the one defendant has with plaintiff, does not make defendant a carrier for purposes of plaintiff and defendant's relationship.

Second, much like its response to defendant's first argument, in response to defendant's second argument, plaintiff fails to address head-on defendant's argument that the FCC has never imposed a duty of information disclosure. Instead, plaintiff again makes unsupported declarations, such as that there is a FCC-imposed duty to disclose information related to fraud. (ECF No. 23 at 16.) As for the statutory provisions and FCC decisions plaintiff cites, plaintiff fails to explain how they require defendant to disclose information. Plaintiff cites two decisions from the FCC. For one of them, plaintiff provides no pinpoint citation, therefore, the Court does not consider it further. As

5

for the other, there is a pinpoint citation, unfortunately for plaintiff the footnote cited does not state that carriers have a duty to prevent fraud. *See United Artists Payphone Corp. v. New York Tel. Co.*, 8 FCC Rcd 5563, 5566 n.44 (1993). In any event, even if the decision in *United Artists* could be construed as imposing a duty to prevent fraud, plaintiff provides no explanation for how the FCC's conclusion—that a company could not be held liable for charges related to fraudulent calls when the company had taken reasonable steps to prevent the calls—results in defendant being required to turn over information to plaintiff.

Plaintiff also cites other authority. Plaintiff cites 47 C.F.R. § 64.2005(d). (ECF No. 23 at 17.) However, even if that regulation could be construed as being applicable, it clearly states that a carrier "may" disclose certain information. In other words, there is no *requirement* that defendant turn over information. Plaintiff also cites § 203(b) of the Communications Act. (*Id*. at 19.) To the extent that citation is not a typo (of § 201(b)), § 203(b) has nothing to do with fraud or duties related thereto. *See* 47 U.S.C. § 203(b) (addressing changes made to, *inter alia*, filed charges and the FCC's ability to modify requirements). Other than the foregoing, plaintiff provides no support for its contention that § 201(b) has been violated.[3]

As a result, because defendant is not a common carrier for purposes of Claim One, and because plaintiff has failed to show that § 201(b) has been violated, the Court grants the motion to dismiss with respect to Claim One.

---

[3] Plaintiff also refers to defendant's "prior advocacy to the FCC on toll fraud" in the 1990's. (ECF No. 23 at 17.) Irrespective of what defendant said in the 1990's, plaintiff makes no argument as to why those statements result in defendant having to disclose the requested information.

B.   **Claims Three, Four, and Five**

Defendant argues that Claims Three to Five should be dismissed for the same reason: they are all barred by a doctrine known as the "filed rate doctrine." (ECF No. 22 at 12-15.) Citing a number of cases, defendant asserts that, under the filed rate doctrine, plaintiff can only seek recovery of its charges through either a filed tariff or a contract between plaintiff and defendant. (*Id*.) In response, plaintiff argues that the facts of this case are different to the ones in the cases cited by defendant because, here, the parties signed a written agreement. (ECF No. 23 at 10.) In essence, plaintiff argues that, when parties have entered into a written contract, the filed rate doctrine does not apply. (*See id*. at 8-14.)

Because it is important to the analysis herein, the Court mentions the following at the outset. Although it is not directly alleged in the Complaint, in their briefing on the motion to dismiss, the parties state, in the parlance of the telecommunications world, that plaintiff is a "competitive local exchange carrier" or "CLEC." (*See* ECF No. 22 at 9; ECF No. 23 at 6.) The Court will follow the parties' lead in that regard in addressing Claims Three to Five.

It is important to do so because, as will be discussed *infra*, CLECs are subject to a somewhat unique set of regulations that implicate the filed rate doctrine. To understand the regulatory landscape of CLECs, the most helpful case, cited by both parties in support of their arguments, is the Ninth Circuit Court of Appeals' recent decision in *CallerID4u, Inc. v. MCI Communications Services Inc.*, 880 F.3d 1048 (9th Cir. 2018). To cut a long story shorter, prior to 1996, § 203 of the Communications Act required most common carriers to set the rates and terms of their interstate telecommunications services in tariffs filed with the FCC. *Id*. at 1052. In 1996, however, Congress gave the FCC authority to "forbear from enforcing § 203's tariff-filing requirements" if the FCC

determined that certain conditions had been met. *Id*. at 1057. Thereafter, following an attempt at "permissive detariffing" with respect to CLECs, the FCC revised its CLEC tariffing system in 2001. *Id*. at 1058-59. The end result of these revisions is that a CLEC has two means by which to charge for interstate access services. *Id*. at 1059.

> First, a CLEC may tariff interstate access charges if its rates are no higher than the rates charged for such services by the competing [incumbent local exchange carrier]. Second, as an alternative to tariffing, a CLEC may negotiate and enter into an agreement with an IXC to charge rates higher than those permitted under the benchmark rule."

*Id*. (quotations and citations omitted).

What does this mean for Claims Three to Five? Well, it is not as straightforward as defendant would like to make out. As far as defendant is concerned, a long line of cases provide that the filed rate doctrine does not permit a CLEC to bring claims other than for breach of contract or breach of tariff. The Court has reviewed the cited cases, and they fully support defendant's argument as it related to filed *tariffs*. Plaintiff, though, makes a valid attempt to distinguish the cases to which defendant cites on the ground that they do not involve the failure to pay under a *contract*. That distinguishing fact is true in many respects. It is not true, however, with respect to at least one of the cases defendant cites.

In *Peerless Network, Inc. v. MCI Commc'n Services, Inc.*, 2015 WL 2455128 (N.D. Ill. May 21, 2015), the plaintiff brought claims for failure to pay charges under both a tariff and a contract. *Id*. at *2. The plaintiff also brought equitable claims in the event that its contract and tariff did not cover the services provided. *Id*. at *8. The court dismissed all of the equitable claims on the ground that they were barred by the filed rate doctrine. *Id*. at *10. Plaintiff makes no meaningful attempt to explain why *Peerless* should not be considered. All plaintiff asserts is that *Peerless* is

8

"difficult to decipher" and "simply wrong." (ECF No. 23 at 11.) The case is not difficult to decipher, and saying it is "simply wrong" does not move the needle very far. Ultimately, given that *Peerless* involved a contract and equitable claims, it is factually similar to this case. Thus, there is at least one factually similar case supporting defendant's argument.[4] That is one more case than can be said for plaintiff's argument, as plaintiff cites not one case where equitable claims were allowed to proceed when parties had entered into a contract.

Nonetheless, there is a reason why both parties in this case cite to *CallerID4u*. It is because there is language therein that supports the arguments of both sides. After its discussion of the regulatory backdrop for telecommunications, the Ninth Circuit addressed the facts before it. Notably, the plaintiff did not have a contract with the defendants and did not have a filed tariff in effect until September 28, 2012. *CallerID4u*, 880 F.3d at 1060. That did not stop the plaintiff, though, from filing claims under state equitable principles. *Id*. at 1052. In affirming the dismissal of the plaintiff's claims of quantum meruit and unjust enrichment, the Ninth Circuit rejected the argument that the filed rate doctrine did not apply. *Id*. at 1063-65. The Ninth Circuit explained that, because the plaintiff did not negotiate a contract, it remained subject to § 203's tariff-filing

---

[4] Defendant also cites a second case on the ground that it is on "all fours with this case." (ECF No. 24 at 5.) That case is *Midcontinent Communications v. MCI Communications Services, Inc.*, 2016 WL 6833944 (D.S.D. Nov. 18, 2016). In *Midcontinent*, the parties entered into a contract that called for payment at the tariffed rate filed with the FCC. *Id*. at *1. After disagreement between the parties, the plaintiff brought claims for breach of contract and unjust enrichment. *Id*. The court found that the filed rate doctrine applied to the plaintiff's claims because the disputed payments arose from the parties' tariff-based contract. *Id*. at *2. The court further found that the filed rate doctrine barred the claim for unjust enrichment because the parties had a valid tariff. *Id*. at *4. Although plaintiff is correct that, in *Midcontinent*, the court stated that the parties had a valid tariff which exclusively governed their rights, this does not take away from the underlying facts that the plaintiff brought a claim for breach of contract and the theory of unjust enrichment was premised upon "contracted-for services" for which the defendant did not pay. *See id*. at *1, 3. Nonetheless, because the *Midcontinent* court's focus on the tariff rather than the contract arguably undermines the persuasiveness of the underlying facts, this Court does not consider it as helpful as the decision in *Peerless*.

requirement and the filed rate doctrine. *Id*. at 1063. And, without a filed tariff, seeking equitable relief would conflict with the FCC's regulatory scheme. *Id*. at 1064.

That is the relevant holding in *CallerID4u*. There is, however, additional noteworthy language in the case. Notably, the Ninth Circuit stated that "a CLEC that elects to negotiate [ ] an agreement with an IXC is not subject to the federal rate-filing requirement as to that agreement.…[W]here a CLEC has entered into the marketplace by negotiating a competitive agreement, a state law action to recover equitable remedies would not interfere with Congress' chosen method of rate filing." *Id*. at 1063 (quotation and alteration omitted). From this, the Court draws the fairly straightforward conclusion that, as far as the Ninth Circuit is concerned, a CLEC that has negotiated a contract *can* recover equitable remedies; it is only when no contract exists that the filed rate doctrine applies. Unfortunately for plaintiff, given that no contract existed in *CallerID4u*, the Ninth Circuit's statements in this regard are merely dicta. *See Tokoph v. United States*, 774 F.3d 1300, 1303 (10th Cir. 2014) ("dicta are statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand.").

Although defendant fails to mention the language above, defendant too cites *CallerID4u* for support. (*See* ECF No. 22 at 13-14; ECF No. 24 at 4.) As defendant observes, in *CallerID4u*, the Ninth Circuit cited various orders from the FCC for the proposition that "state law equitable claims would conflict with the current CLEC regulatory scheme" because "CLECs are required to either negotiate agreements or file tariffs under § 203…." *CallerID4u*, 880 F.3d at 1064. The problem with reliance on the orders from the FCC is that they have been interpreted by at least one district court as barring state equitable claims even if a contract has been executed, *see Peerless*, 2015 WL

10

2455128, at *10, which is obviously a different result than the dicta discussed *supra* appears to contemplate.

This Court can see the merit to both sides of the parties' argument. In favor of plaintiff is that the filed rate doctrine, at least originally, concerned rates or tariffs filed with a regulatory agency such as the FCC. *See TON Services, Inc. v. Qwest Corp.*, 493 F.3d 1225, 1236 (10th Cir. 2007) ("The doctrine generally requires that providers of services in regulated industries, such as the communications and shipping industries, adhere to tariffs approved by and filed with the regulatory agency overseeing the industry."). That is presumably why it is called the *filed rate* doctrine. In allowing CLECs to enter into contracts with IXCs, though, the prices set forth in such contracts are neither *rates* in the sense of tariffs nor *filed* with the FCC. As the Ninth Circuit observed, such contracts are instead a manifestation of the marketplace. *See CallerID4u*, 880 F.3d at 1063. Why prices in a negotiated contract should have the same barring effect on state equitable claims as filed tariffs, thus, could be reasonably questioned.

In favor of defendant is that the current CLEC regulatory regime requires either a negotiated agreement or a filed tariff. *See id*. at 1059. As the FCC appears to have done, this could be taken as meaning that a CLEC can only seek compensation through one of those mechanisms. *See AT&T Corp. v. All Am. Tel. Co.*, 30 FCC Rcd 8958, 8963 n.50 (2015), *rev'd in part*, *All Am. Tel. Co., Inc. v. FCC*, 867 F.3d 81, 94-95 (D.C. Cir. 2017) (reversing the FCC's determination that CLECs could not seek equitable relief under state law because the FCC lacked authority to discuss the merits of those claims). That is certainly defendant's position. (*See* ECF No. 24 at 4.)

Ultimately, with respect to CLECs that have negotiated a contract, this Court is not convinced by defendant's argument. The Court's principal concern is that once a CLEC decides to negotiate

a contract, the prices or rates at which it charges for its services are no longer subject to regulation; instead, they are subject to what the marketplace will allow. So, yes, the requirement to negotiate a contract is a form of regulation, but, once that requirement is met, the purpose of the filed rate doctrine—to prevent price discrimination and ensure a regulatory agency's exclusive role in ratemaking, *see Ton Services*, 493 F.3d at 1236—slips away because the agency has no role in deciding the price to which the contracting parties agree. The purpose of the filed rate doctrine is only truly accomplished when a CLEC files a tariff, or when a CLEC fails to file a tariff and fails to enter into a contract. This is because, unless a CLEC enters into a contract, the FCC has determined what is a reasonable tariffed rate—anything that does not exceed a benchmark level. *See CallerID4u*, 880 F.3d at 1059. For a contract-less CLEC to be able to go outside of this reasonable tariffed rate would, thus, infringe on the FCC's ratemaking role. The same is not true of a negotiated contract, where the only control on the negotiated rate is what the market, not the FCC, will allow.

The difference between filing a tariff and negotiating a contract is further reflected in the statutory provisions and/or regulations requiring them. As the Tenth Circuit Court of Appeals has explained, "[t]he federal filed rate doctrine, codified at 47 U.S.C. § 203, is a central tenet of telecommunications law." *Ton Services*, 493 F.3d at 1236. Section 203 is the provision requiring a tariff to be filed. Section 203, though, does not require a CLEC to enter into a contract. That requirement is, instead, found in an order of the FCC exercising the FCC's authority under 47 U.S.C. § 160. *See In re Access Charge Reform*, 16 FCC Rcd 9923, 9956-58 (2001) ("*Access Reform Order*"). The very purpose of § 160 is to *forbear* from enforcing provisions such as § 203, *see* 47 U.S.C. § 160(a), or, in other words, to forbear from enforcing the codification of the federal filed rate doctrine. As the FCC stated in the *Access Reform Order*, in requiring negotiation of a contract in

12

order to charge rates in excess of the benchmark, the FCC was imposing "mandatory detariffing" on CLECs. *Access Reform Order*, 16 FCC Rcd at 9956.

In this light, it is not clear why the filed rate doctrine should be extended to a contract over which the FCC has deregulated away any control. Put another way, if the Court was writing on a blank canvas, it would likely find that the filed rate doctrine does not apply in this case because plaintiff and defendant have entered into a negotiated contract. The Court, though, does not believe it is writing on a completely blank canvas. Although neither party mentions the case, in *Union Tel. Co. v. Qwest Corp.*, 495 F.3d 1187 (10th Cir. 2007), the Tenth Circuit affirmed the dismissal of the plaintiff's claims for unjust enrichment and quantum meruit. *Id*. at 1197. In doing so, the Tenth Circuit explained that federal law required local exchange carriers, like the plaintiff and the defendant in that case, to establish reciprocal compensation agreements through private negotiation, with compensation determined by the rates in the agreement. *Id*. at 1192, 1196. Before addressing the equitable claims, the Circuit determined that neither a valid agreement nor a valid tariff existed between the parties. *Id*. at 1190, 1192-94. The Circuit then concluded that the plaintiff could not bring claims for unjust enrichment or quantum meruit because allowing the plaintiff to do so "would frustrate the federal regulatory mechanism," requiring rates to be set through negotiated agreements. *Id*. at 1197.

Although the facts and relevant regulations/statutory provisions are different here, the Court does not see why a different result should be reached than the one in *Union Tel*. The obvious difference between this case and *Union Tel.* is the fact that, here, there is a valid agreement between the parties. The Court does not believe that would change the result reached by the Tenth Circuit. Notably, similar to *Union Tel.*, here, federal law—through the regulations imposed by the FCC and

§ 203—requires a CLEC to either file a tariff or negotiate an agreement in order to be compensated. *See CallerID4u*, 880 F.3d at 1059. The fact that the requirement for a written agreement is not found in § 203 does not appear to have caused the Tenth Circuit any concern in *Union Tel.*, given that a similar requirement in that case was found in 47 U.S.C. §§ 251(b)(5), 252. In addition, the fact that the parties in *Union Tel.* were free to negotiate, mediate, or potentially arbitrate the terms of their agreement, and thus, not involve the FCC in setting rates, also does not appear to have caused the Tenth Circuit any concern in concluding that recovery under equitable theories would still "frustrate" the federal regulatory mechanism. *See Union Tel.*, 495 F.3d at 1197. The Court can see no reason why the regulatory mechanism in *Union Tel.* would be frustrated, while the regulatory mechanism in this case would not be frustrated if plaintiff's claims for equitable relief were allowed to proceed. As a result, the Court believes that the reasoning and result in *Union Tel.* applies with equal force here, and thus, Claims Three to Five must be dismissed.[5] Therefore, the motion to dismiss is granted with respect to those claims.

IV. **Conclusion**

For the reasons discussed herein, defendant's partial motion to dismiss (ECF No. 22) is GRANTED, and Claims One, Three, Four, and Five are DISMISSED WITH PREJUDICE.

---

[5] The Court notes that *Union Tel.* is cited and discussed in *CallerID4u*. The Ninth Circuit relied, in part, on *Union Tel.* in reaching its decision that a CLEC who neither filed a tariff nor negotiated a contract could not seek equitable relief. This Court agrees that *Union Tel.* supports the ultimate decision reached in *CallerID4u* to preclude the plaintiff's equitable claims, given that, in both cases, the plaintiff failed to negotiate a contract. *Union Tel.*, though, does not support the dicta in *CallerID4u* that a CLEC who negotiates a contract would be entitled to pursue equitable remedies.

**SO ORDERED.**

DATED this 6th day of August, 2018.

                                                BY THE COURT:

                                                _____
                                                RAYMOND P. MOORE
                                                United States District Judge